IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ALTON TOLSON, | * | |
| Plaintiff | * | |
| v | * | Civil Action No. ELH-11-3071 |
| LEON CRUMP, et al., | * | |
| Defendants | * | |

\*\*\*

**MEMORANDUM**

Alton Tolson, an inmate at the State of Maryland's North Branch Correctional Institution ("NBCI"), has filed a civil rights complaint under 42 U.S.C. § 1983, in connection with an incident that occurred in February 2009, when he was confined at Jessup Correctional Institution ("JCI" or "Jessup"). Claiming that he was the victim of excessive force inflicted by prison guards, plaintiff seeks both compensatory and punitive damages. Defendants Sgt. Reginald Walker, Sgt. Leon Crump, and Correction Officer II Phillipe Jordan have moved for summary judgment. ECF 18.[1] Their motion is supported by numerous exhibits, including an Incident Report, Exhibit 1 (ECF 18-3) (78 pages), plaintiff's medical records, Exhibit 5 (ECF 18-7) (217 pages), and several declarations. Plaintiff was advised of defendant's motion, in accordance with the requirements of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), *see* ECF 19, and he responded. *See* ECF 27 & 30.[2] Upon review of the submissions, an oral hearing in this matter is unnecessary. *See* Local Rule 105.6 (D. Md. 2011).

---

[1] Defendant Anthony Harris has not been served with the complaint.

[2] Plaintiff filed three requests for an extension of time in which to respond. *See* ECF 20, 22, 25. I granted all three motions. *See* ECF 21, 23, 29.

**Factual Background**

Plaintiff alleges that at Jessup on February 10, 2009, while he was handcuffed behind his back and under escort to the medical unit by officers Jordan, Harris and Crump, he was assaulted by Walker. Plaintiff claims that Walker hid behind the back entrance to the property room and repeatedly struck plaintiff in his face with a closed fist, stating: "Why you do that to my homegirl Yo?" The comment apparently referred to an assault upon a female staff member in which plaintiff was involved. Further, plaintiff alleges that Jordan, Harris, and Crump then joined in the "brutal" beating, hitting plaintiff continuously over the head and kicking him as he fell to the ground.[3] ECF 1. According to plaintiff, the assault lasted several minutes.

Plaintiff recounts that he was then taken into the property room, rather than to the medical unit, where he was assaulted again. He alleges that Crump and Jordan took turns looking out the window and then assaulting him, while Walker and Harris continuously beat him. *Id*. According to plaintiff, he was then taken to the door of the medical unit, "dragged to the ground," and assaulted a third time. Then, defendants picked him up and threw him into the medical "bullpen." Thereafter, he was transported to an area hospital for treatment. *Id*.

Prison officials conducted an investigation of the incident and concluded that the accounts of the transfer of plaintiff to the medical unit and plaintiff's injuries were consistent with the guards' contention that plaintiff was injured as a result of plaintiff's own combativeness, rather than by the guards' malicious use of force. *See generally* Ex. 1. For example, Warden John Wolfe concluded that "the use and level of force was appropriate and in accordance to the

---

[3] Plaintiff attached to his complaint a copy of correspondence from the Prisoner Rights Information System of Maryland, Inc., declining to assist him with his claim and noting that review of two video tapes of plaintiff's escort "show no evidence of attack by the escorting officers." ECF 1, Attachment. The court has not been provided the tape. It does not appear, however, the tape(s) recorded the entirety of the escort. *See* ECF 18, Ex. 1, p. 27, "no video of entering MPR from the 217 door."

Division's Use of Force Manual reporting guidelines." Ex. 1 at 2. In addition, defendants point out that a prisoner advocacy group reviewed security tapes from the date in question and there was no evidence of an assault captured on the security cameras. *See* ECF 1-1.[4]

Defendants dispute the veracity of plaintiff's account. Although defendants concede that plaintiff suffered physical injuries on February 10, 2009, they note that the injuries were not as serious as plaintiff would suggest, and they claim that the use of force was justified, reasonable, and necessary.

Defendants contend that on February 10, 2009, at approximately 1:18 p.m., plaintiff assaulted Lieutenant Denise Davis by punching and kicking her in the face and upper body. Ex. 1.[5] In order to stop the attack upon Davis, plaintiff was maced. Officer Tracy Palmer, Lieutenant Joanne White, and Lieutenant Michelle Mann responded to the area of the assault and placed plaintiff in handcuffs. Officers Jordan, Crump, and Harris also responded to the scene and sought to escort plaintiff toward the back of the Multi-Purpose Building, while Mann and Palmer escorted Lt. Davis through the front of the Multi-Purpose Building in order to keep the two separate. *Id*.

Crump, Jordan, and Walker aver that, during the escort, plaintiff was combative - kicking, spitting and refusing to proceed to the medical unit. *Id*., *see* Ex. 1, 2, 3, 4 (Incident Report and Declarations of Crump, Jordan, and Walker, respectively). Walker, the officer in charge of the Property Room that day, observed plaintiff resisting the other officers and went to

---

[4] The significance of the lack of evidence on tape is not apparent. There is no dispute that plaintiff was subjected to the use of force and injured.

[5] Lt. Davis instructed plaintiff to return to his housing unit from the yard, but plaintiff insisted he had to go the property room. Lt. Davis was knocked unconscious and suffered a concussion as a result of plaintiff's assault upon her. She was transported to University of Maryland Shock Trauma Center for treatment. Ex. 1.

assist. *Id.*, Ex. 4. As the escorting officers attempted to subdue plaintiff by taking him to the ground, he fell with the weight of the officers against him. They claim that plaintiff hit his face on the concrete floor, injuring his left eye and face. Ex. 1, 2, 3, & 4. Due to plaintiff's continued resistance, the group carried plaintiff to the medical unit. Plaintiff continued to resist and, according to defendants, he slipped from the grips of the escorting officers several times. Upon arriving at the medical unit, plaintiff remained combative. Therefore, Walker put plaintiff in leg irons and placed him inside the medical holding cell to await treatment. *Id*.

At JCI, plaintiff was examined by Kathleen Douglas, R.N. and John Moss, P.A., who observed significant swelling, redness, bruising, and a subconjunctival hemorrhage on and around plaintiff's left eye. Ex. 1 at 33; Ex. 5. Douglas also noted possible damage to the left eye muscle. A small 1 cm superficial cut on the top of plaintiff's left hand, and plaintiff's complaints of bilateral wrist pain were noted. At the direction of Moss, plaintiff was transported to the University of Maryland Medical System (UMMS) emergency room for further evaluation. Ex. 1 at 33-34.

Plaintiff's emergency medical records (Ex. 6) show that a UMMS nurse evaluated plaintiff, and noted swelling on the left side of plaintiff's face and a periorbital hematoma to plaintiff's left eye, which was swollen shut. Ex. 6 at 3. A mark was also observed on plaintiff's left hand. *Id*. at 3, 7. An ice pack was provided and plaintiff was also examined by a physician, who noted the facial contusions and ordered a CT scan of plaintiff's facial bones and periorbital edema. Ex. 6 at 5-9. The physician further noted that the CT scan was negative for fracture or dislocation. *Id*. at 11. The injury to plaintiff's face was described as a "soft tissue contusion" on the left side. *Id.* Plaintiff was released from UMMS that evening with prescriptions for

4

antibiotics as well as Percocet and ibuprofen for pain relief. Ex. 1 at 35-38. Photographs of plaintiff's injuries taken three weeks after the incident show his eye had healed. Ex. 10.

Plaintiff was subsequently transferred to NBCI.[6]

Harris filed a Notice of Inmate Rule Violation and Disciplinary Hearing on February 10, 2009, regarding plaintiff's conduct during his escort to the medical unit. Ex. 1 at 52. On February 19, 2009, plaintiff was found guilty of a Rule 100 violation (disruptive behavior) and a Rule 101 infraction (assault on staff). Ex. 7.

Plaintiff filed a grievance on February 19, 2009, directly to the Department of Public Safety and Correctional Services, Inmate Grievance Office ("IGO"), alleging that he had been assaulted by several correctional officers. Ex. 8 at 6. Because plaintiff had not filed a Request for Administrative Remedy, the IGO dismissed his grievance on April 1, 2009. Ex. 8 at 2-3.

On March 3, 2009, plaintiff filed a Request for Administrative Remedy with the Maryland Division of Correction regarding the February 10, 2009 incident. Ex. 7 at 10-11. In addition to the defendants named in the instant complaint, plaintiff alleged in the ARP that he was assaulted in the medical unit by Officers Barnett, Foye, Johnson, Milloy, Fordham, Fields, and Taylor. The ARP was dismissed by the Warden and plaintiff appealed to the Commissioner. He also filed a grievance appeal to the IGO. In his appeal to the IGO, plaintiff listed the foregoing officers as having assaulted him on February 10, 2009, and also added Officer Green as an alleged assailant. Ex. 7.

The IGO dismissed the second grievance. In a letter dated August 24, 2009, Executive Director Scott Oakley wrote that Tolson's allegations in the second Request for Administrative Remedy (NBCI No. 0740-09) arose from the same set of circumstances as his disciplinary

---

[6] Plaintiff advised he was upset about, among other things, being notified that he was to be transferred to the NBCI's Behavioral Management Program.

action, and the principles of "res administrata" and collateral estoppel barred plaintiff from challenging the disciplinary finding of guilt. Exh. 7 at 2. Tolson initially filed a Petition for Judicial Review in the Circuit Court for Allegany County, challenging the IGO decision. *See* Case No. 01-C-09-32843L, *Alton Tolson 311061, Petition for Judicial Review of the Decision of the Secretary of Public Safety & Corr. Serv., In the Case of IGO No. 20091841* (Exhibit 11, Records of Circuit Court for Allegany County, Case No. 01-C-09-32843 at 5). However, on October 21, 2009, his petition was dismissed, without prejudice, including for his failure to pay the filing fee or properly petition the court for waiver of prepayment of the filing fee. *Id.* at 8-9. Tolson was also given leave to amend to show that he had exhausted his administrative remedies. But, he failed to do so. Therefore, his case was dismissed, with prejudice, on February 19, 2010. Ex. 11 at 10.

## Standard of Review

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must "set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*,

346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). Moreover, the court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

Ordinarily, summary judgment is inappropriate when, as here, "the parties have not had an opportunity for reasonable discovery." *E.I. du Pont*, *supra*, 637 F.3d at 448-49. However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL

665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb. 14, 2011)). "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). On the other hand, the non-moving party's failure to file a Rule 56(d) affidavit does not obligate a court to issue a summary judgment ruling that is obviously premature.

Plaintiff has not filed an affidavit under Rule 56(d). Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that

more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'"  *Id.* at 244-45 (internal citations omitted).

## Discussion

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege a violation of a federal constitutional right or a right secured by federal law.  *See Baker v. McCollan*, 443 U.S. 137 (1979).  A convicted inmate's claim of use of excessive physical force is examined in the context of the Eighth Amendment's prohibition against cruel and unusual punishment.  *See Whitley v. Albers*, 475 U.S. 312, 319-21 (1986); *see also Wilkins v. Gaddy*, 559 U.S. 34, 130 S. Ct. 1175, 1176-78 (2010) (*per curiam*); *Hudson v. McMillan*, 503 U.S. 1, 7-9 (1992).

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson*, 503 U. S. at 6-7.  This court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response.  *See Whitley*, 475 U. S. at 321.  The absence of significant injury alone is not dispositive of a claim of excessive force, however.  *Wilkens*, 130 S.Ct. at 1178.  Rather, the extent of injury is one factor indicative of whether the force used was appropriate in a particular situation.  But, if force is applied maliciously and sadistically, liability is not avoided simply because the prisoner had "the good fortune to escape" serious harm.  *Wilkens,* 130 S.Ct. at 1179.  As the Court said in *Wilkens*, "[i]njury and force . . . are only imperfectly correlative, and it is the latter that ultimately counts."  *Id*. at 1178.

In his complaint, plaintiff alleges that he was viciously assaulted by defendants while he was handcuffed, apparently in retribution for his own conduct in regard to another correctional officer. The defendants deny the allegations of brutality, claiming that plaintiff attacked a correctional officer and then repeatedly refused to comply with orders to be escorted, while spitting, kicking, hitting, and resisting all efforts to subdue him.

Clearly, the central facts of the case are hotly disputed. Whether plaintiff was assaulted as alleged remains in dispute, as do the facts surrounding the amount of force used, and whether the application of force used to subdue plaintiff was reasonable and necessary. Indeed, in their Memorandum, defendants concede: "Were Mr. Tolson's allegations true, of course, a series of brutal beatings such as he has vicariously described certainly would constitute excessive force by the defendants." ECF 18-1 at 11.

Such factual disputes can "be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," and thus, summary judgment is inappropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations…are jury functions, not those of a judge…."); *see also Ray Commc'ns., Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 305 (4th Cir. 2012). *See generally Meyers v. Baltimore County*, ____ F.3d ____, No. 11-2192, slip op. at 10-12 (4th Cir. Feb. 1, 2013); *Henry v. Purnell*, 652 F.3d 524 (4th Cir. 2011) (*en banc*), *cert. denied*, 132 S.Ct. 781 (2011).

Alternatively, defendants urge the court to grant summary judgment in their favor because they are protected by qualified immunity. Such a determination would be equally premature.

With respect to claims under 42 U.S.C. § 1983, courts have recognized qualified immunity as an affirmative defense. "The doctrine of qualified immunity protects police officers

and public officials from claims of constitutional violations 'for reasonable mistakes as to the legality of their actions.'" *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). Put another way, qualified immunity shields government officers from liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Thus, "officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful" will be entitled to immunity from suit. *Purnell*, 652 F.3d at 531; *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231 (citation omitted). Because qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law," *Harlow*, 457 U.S. at 818, an officer who makes an honest but objectively unreasonable mistake is not protected by qualified immunity. "Although officers are only human

and even well-intentioned officers may make unreasonable mistakes on occasion, the doctrine of qualified immunity does not serve to protect them on those occasions." *Purnell*, 652 F.3d at 535.

The qualified immunity analysis can be separated into two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional right," *Saucier*, 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, 677 F.3d at 662 (citation omitted). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236; *see also Merchant*, 677 F.3d at 661-61 (stating that the "two inquiries . . . may be assessed in either sequence").

The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, ___ U.S. ___, 132 S. Ct. 1235, 1245 (2012) (citation and some internal quotation marks omitted). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.' In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Reichle v. Howards*, ___ U.S. ___, 132 S. Ct. 2088, 2093 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. ___, 131 S. Ct. 2074, 2078, 2083 (2011)) (some internal quotation marks and citations omitted). "If the law at th[e] time [of the alleged violation] was not clearly established," the official will be entitled to qualified immunity, because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said

to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818.  On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818-19.

The Court recognizes the value of an early determination of immunity defenses.  *See Torchinsky v. Siwinski*, 942 F.2d 257, 260-61 (4th Cir. 1991).  But, the determination of whether defendants are entitled to qualified immunity is more appropriately addressed after the facts of the case have been further developed.  Accordingly, dismissal of plaintiff's complaint based on qualified immunity is not proper at this time.


March 8, 2013                               /s/                                   
                                     Ellen Lipton Hollander
                                     United States District Judge